# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

|  |  |  |
|---|---|---|
| DANA TURBYFILL, | ) | |
| | ) | Case No. 1:23-cv-88 |
| *Plaintiff,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| TENNESSEE DEPARTMENT OF | ) | |
| HUMAN SERVICES, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## MEMORANDUM OPINION

Before the Court is Defendant Tennessee Department of Human Services' ("DHS")
motion for summary judgment (Doc. 15). For the following reasons, the Court will **GRANT**
DHS's motion.

## I.     BACKGROUND

This is a disability-discrimination action. Plaintiff Dana Turbyfill began working for
DHS on January 19, 2011. (Doc. 25-2, at 5.) In 2021, Turbyfill started a position as a licensing
consultant, and her job duties included investigating alleged licensure-regulation violations,
interviewing parties involved in alleged violations, and maintaining working relationships with
child- and adult-care agencies. (*Id.* at 5–6, 64.) About seventy-five percent of the time, her role
required on-site visits with agencies, parents, or employees of the Tennessee Department of
Children's Services. (Doc. 25-3, at 116.) Turbyfill, along with four other DHS employees,
comprised the "Southeast 1 Team," and this team worked throughout various counties in
Southeastern Tennessee. (*Id.* at 117.)

On March 27, 2022, Turbyfill suffered a concussion and other injuries to her head, neck,

back, jaw, and arm. (Doc. 25-2, at 19; Doc. 26-1, at 2–3.) Turbyfill averred that these injuries "substantially affected [her] ability to read, concentrate, work on the computer, and sit for long periods of time." (Doc. 26-1, at 6.) The day after her injury, Turbyfill saw her primary-care physician, Dr. Katherine R. Hall. (*Id.* at 2–3.) At Dr. Hall's instruction, Turbyfill returned to the hospital twice over the next few days. (*Id.*) Turbyfill's treating physicians at the hospital instructed her to rest and to "take it easy." (Doc. 25-2, at 20.)

On March 30, 2022, Turbyfill informed her supervisor, Jenann Lay, of her injury. (*Id.* at 70–71.) Turbyfill followed up the next day, informing Lay that she would need another day off and that she was "not sure" if she would be able to work the following day. (*Id.* at 69.) Lay told Turbyfill to "[s]tay off of [her] email" and that she hoped Turbyfill would "feel better soon." (*Id.*) Turbyfill never returned to work. (*Id.* at 22.)

Two weeks later, Lay asked Turbyfill to come into DHS's office. (*Id.*) Lay, along with John Sanders—the regional manager of the Southeast 1 Team and Lay's supervisor—informed Turbyfill that DHS had terminated her. (*Id.* at 22–23.) In her termination letter, DHS did not mention Turbyfill's recent injury or the resulting missed work; instead, it cited "inefficiency and negligence in the performance of [her] duties" and various performance issues occurring in the two years before her injury. (*Id.* at 72–73.) Turbyfill appealed her termination through an internal DHS procedure. (*Id.* at 25.) On April 26, 2022, Turbyfill and DHS executed a settlement agreement which provided that: DHS would reinstate Turbyfill; she would receive backpay for the time between her termination and the agreement; and she would report to work the next day, or, if she was unable to work, she would either request leave under the Family Medical Leave Act ("FMLA"), or request an accommodation under the Americans with

Disabilities Act ("ADA")[1]. (*Id.* at 75.) That same day, Turbyfill requested leave under the FMLA, and Peter Floyd, the supervisor of DHS's Protected Leave Team, emailed her the application to do so. (*Id.* at 213.) On May 2, 2022, Floyd recommended that Turbyfill file a claim under DHS's short-term-disability policy. (*Id.* at 217.) Turbyfill submitted her FMLA application on May 13, 2022, and, on May 16, 2022, DHS approved Turbyfill for FMLA leave. (*Id.* at 225–26.)

The FMLA application included a form entitled Certification of Health Care Provider for Employee's Serious Health Condition under the FMLA, which Dr. Hall completed. (*Id.* at 221.) In this form, Dr. Hall described Turbyfill's conditions as "arthritis, emotional trauma of episode, ongoing muscular spasms/fatigue" and "concussion." (*Id.* at 223–24.) Dr. Hall also stated that her best estimate for the duration of Turbyfill's treatment was "pending," but her best estimate was that Turbyfill's conditions would last two months. (*Id.* at 222–23.) For leave requests when a doctor does not know when the patient will be able to return, Floyd testified that DHS "tries to be flexible and [] work[s] on that with them." (*Id.* at 132.) Based on the application, DHS calculated Turbyfill's leave as retroactively starting on March 28, 2022—the date Dr. Hall wrote in the form that Turbyfill's conditions began—and DHS calculated Turbyfill's leave to end on May 28, 2022—as Dr. Hall opined that the conditions would last two months. (*Id.* at 222, 225, 237.)

On June 3, 2022, Floyd informed Turbyfill that her FMLA leave would expire on June 22, 2022, and that, if she was "unable to return to work once [her] FMLA has exhausted," to let

_____

[1] While DHS internally referred to the accommodation process as the "ADA accommodation" process, Turbyfill brings claims under the Rehabilitation Act. All references to "ADA accommodation" by the parties in their internal communications are equally relevant to Turbyfill's claims under the Rehabilitation Act.

him know, and he would "make a referral to Employee Relations so we can start the special leave without pay process." (*Id.* at 76.) Turbyfill responded that she was "going to wait until I see [Dr. Hall] and see what [she says] about my return to work." (*Id.* at 237.) Floyd replied, "[j]ust get that updated medical sent in after your appointment[,] and I'll get everything taken care of for extending your leave." (*Id.* at 236.) Turbyfill had an appointment with Dr. Hall on June 23, 2022, but she did not communicate the details of the visit to DHS until June 30, 2022. (*Id.* at 253.) Dr. Hall did not clear Turbyfill to return to work; instead, she "recommended extending her time at home" and "hope[d] to give her full [return to work] notice" after a reevaluation on July 15, 2022 (*Id.* at 253.)

In the meantime, as Turbyfill had not provided DHS with an update, on June 28, 2022, it informed her that, because she had exhausted her FMLA leave and had not submitted "updated medical documentation to support [her] continued absence," her current absence was "unapproved and authorized." (*Id.* at 77.) It instructed her that she must "return to work immediately with a release from [her] healthcare provider" or "provide medical documentation before July 5, 2022, to support [her] continued absence." (*Id.* at 77–78.) Lastly, it warned her that "failure to return to work could be considered job abandonment . . . and further notice shall not be given." (*Id.* at 78.)

After receiving this letter, Turbyfill detailed her June 23, 2022 appointment with Dr. Hall to Floyd, namely that: Dr. Hall had not released her to return to work; Dr. Hall scheduled a reevaluation on July 15, 2022; Dr. Hall was supposed to have sent DHS a letter stating such; she would follow up with Dr. Hall to ensure DHS received this letter; and the process was "very confusing for me due to you all are telling me one thing and telling me I have to return to work immediately[,] and [Dr. Hall] sen[ding] short term disability information on the same day I saw

[her]." (*Id.* at 242.)  Floyd responded:

> [DHS has] not received any documentation from your doctor regarding your appointment on June 23, 2022.  Since they haven't released you yet I just need them to e-mail or fax me a statement that confirms you aren't released to return to work at this time until your next appointment on July 15, 2022.  Since your FMLA has exhausted and we don't have any supporting medical documentation[,] your absence is currently considered unapproved and unauthorized.  That is what prompted the return to work letter to be sent out with a deadline of July 5, 2022[,] to either return to work or provide the updated medical documentation.  If you can have your provider get that statement sent over to me today[,] I'll get everything updated and taken care of.

(*Id.* at 241.)  DHS received a statement from Dr. Hall on June 30, 2022, and Floyd told Turbyfill that he would "work on getting everything taken care of for [her]."  (*Id.* at 250.)  Floyd testified that, at this point, Turbyfill had "complied with everything and [was] in good standing."  (*Id.* at 156.)  And, on July 1, 2022, Turbyfill received a raise based on her yearly performance evaluation.  (*Id.* at 256.)

Nonetheless, Turbyfill had exhausted her FMLA leave, and Floyd "made a referral [] to start the ADA [accommodation] process," which is processed by DHS's Employee Relations Team.  (*Id.* at 162, 207.)  On July 5, 2022, Jennifer Woodall, a member of the Employee Relations Team, emailed Turbyfill the instructions for requesting an ADA accommodation, "such as leave as an accommodation."  (*Id.* at 257.)  This application included an ADA questionnaire and a medical-release form.  (*Id.*)  Woodall stated that, if Turbyfill did not respond in five days, her case would "be closed due to insufficient information," but also noted that DHS "can re-open [her] case at any time."  (*Id.*)

On July 14, 2022, Stephanie Harris, another member of the Employee Relations Team, emailed Turbyfill noting that she had not yet completed the required forms.  (*Id.* at 83.)  She further warned Turbyfill that if DHS did not "receive your completed forms within five business days[,] your ADA Request will be considered to have insufficient information and will be moved

5

to inactive status." (*Id.*)  There is no evidence that Turbyfill completed the forms, and she

testified that she did not respond to Harris. (*Id.* at 37–38.)  Rather, Turbyfill testified that "[t]he

only person that I was having any communication with was Peter Floyd." (*Id.*)

On July 18, 2022, Floyd informed Turbyfill that DHS had not received an updated

medical statement from Dr. Hall and asked if DHS should expect one. (*Id.* at 262.)  Turbyfill

informed him that she visited Dr. Hall on July 15, 2022, that Dr. Hall again did not release her to

return to work, and that DHS "should be receiving a medical statement soon." (*Id.*)  By July 22,

2022, DHS still had not received Dr. Hall's statement, and Floyd again contacted Turbyfill. (*Id.*

at 264.)  Turbyfill responded that she would "call them now and tell them to send it asap." (*Id.*)

On July 28, 2022, Turbyfill told Floyd that her "message went to [the] wrong nurse[,] and [Dr.

Hall] didn't get the message"; that she "went by there earlier today and talked to the right

[nurse]"; and that the statement would be faxed over shortly. (*Id.* at 266.)  DHS received Dr.

Hall's statement that day. (*Id.* at 267.)  Dr. Hall again communicated that Turbyfill was still not

capable of returning to work and scheduled another reevaluation on September 14, 2022. (*Id.*)

On August 8, 2022, Amy Neufeld, DHS's human resources director, sent Turbyfill a

letter requesting "additional information and documentation regarding [her] medical condition."

(*Id.* at 269.)  Neufeld acknowledged receipt of Dr. Hall's prior medical statements, as well as the

information Dr. Hall had provided in her prior FMLA application. (*Id.*)  Neufeld, however, went

on to explain:

> You exhausted your FMLA leave on June 22, 2022.  Since that time, we have
> continued to receive notices indicating a continuing need for you to remain off
> work; however, there has been no other information included in these notices
> regarding the expected duration of the continued medical need for leave other
> than indicating re-evaluation.  Please obtain specific information from your
> medical provider to include the projected duration or end date for the period of
> illness or incapacity.

(*Id.*)  Turbyfill averred that she was confused that Neufeld asked for a projected duration or end date of her leave because Dr. Hall had not determined a return-to-work date.  (Doc. 26-1, at 5.)  Floyd testified that "[g]enerally speaking, [DHS] [] like[s] to ask for at least [an] estimated return-to-work date.  That helps [DHS] determine [its] leave adjustments for leave after FMLA has exhausted."  (Doc. 25-2, at 173.)  He also testified that it is not unusual for a doctor to be unable to provide a specific time an employee can return to work.  (*Id.* at 173–74.)

Turbyfill responded that Dr. Hall was "working on the [requested] information" and that Dr. Hall had another reevaluation scheduled for September 14, 2022.  (*Id.* at 91.)  On August 18, 2022, Floyd informed Turbyfill that Dr. Hall had not yet faxed the requested information.  (*Id.* at 95.)  Turbyfill responded that Dr. Hall has "provided all the needed information to you already" and that "[i]f there is a form or whatever that you are needing, you can email it to me[,] and I will get it to them."  (*Id.* at 94–95.)  Floyd then replied that DHS did not require any specific form; instead, it was seeking "an explanation of your current condition keeping you from returning to work and an estimated return to work date."  (*Id.* at 93.)  He went on:

> In essence[,] the ADA committee needs to be able to examine how long you have been out and what [] your return to work timeline looks like . . . I'll be happy to let the Employee Relations team know that your doctor feels enough information has been submitted for you until your next appointment.  If anything else is needed I'll follow up.

(*Id.* at 93–94.)  Turbyfill replied, "I'll do whatever I need to do, I'm sorry but thats [sic] what they're telling me."  (*Id.* at 93.)

On August 22, 2022, Turbyfill asked Floyd if he could pass on information to those evaluating her leave request that she "had several health issues come up" relating to contracting COVID-19.  (*Id.* at 97.)  Floyd told Turbyfill that she could "add[] to any documentation about [her] absence" and that he would "let them know you have had Covid and that has been an

ongoing issue." (*Id.* at 96.)

Turbyfill visited Dr. Hall for another reevaluation on September 14, 2022. (Doc. 26-1, at 2–3.) Dr. Hall testified that, at this visit, she cleared Turbyfill to return to work on October 9, 2022.[2] (Doc. 25-3, at 71–72.) But Turbyfill did not inform DHS that she could return to work. (Doc. 25-2, at 186–88.) Floyd testified that he did not receive any information indicating that Dr. Hall cleared Turbyfill to return to work. (*Id.* at 186–88.) Turbyfill also testified that she does not remember if she sent Dr. Hall's letter to DHS, that she does not remember if she followed up with Dr. Hall to make sure she sent the letter to DHS, and that she does not remember if Dr. Hall told her that she had sent the letter to DHS. (*Id.* at 51–52.)

On September 15, 2022, Lay emailed Floyd, "I was wanting to verify that [Turbyfill] did not return to work [on September 14, 2022] and see if we have a new Dr. [s]tatement with a new return to work date." (*Id.* at 282.) Floyd responded:

> [Employee Relations] is handling Ms. Turbyfill's case[,] and we mentioned her during our weekly meeting this morning. I confirmed that I have not received any updated medical information regarding her absence, and as far as I was aware she hadn't returned to work either. Has [Turbyfill] made any communications to you about returning to work at all? I just wanted to check and make sure since neither myself or [Employee Relations] have heard from her. I would recommend reaching out to Jennifer Woodall, our [Employee Relations] Manager[,] and she should be able to discuss next steps for you since Ms. Turbyfill hasn't returned to work yet.

(*Id.* at 281.) In deposition, Floyd acknowledged that it usually took Dr. Hall several days to submit medical statements after a visit and that he expected another statement from Dr. Hall after the September 14, 2022 appointment but that he never asked Turbyfill about the missing statement. (*Id.* at 194–95.)

---

[2] Although Dr. Hall testified that Turbyfill could return to work on October 9, 2022, the next non-weekend workday was October 10, 2022, so the Court will refer to October 10, 2022, as the date Turbyfill could return to work.

On September 20, 2022, DHS terminated Turbyfill, notifying her of the termination by letter. (*Id.* at 99). DHS cited job abandonment as the cause of Turbyfill's termination and outlined that it approved her for FMLA leave from March 28, 2022, through May 27, 2022. (*Id.*) It also described its requests for additional medical information. (*Id.* at 99–100.) DHS further detailed, "Neufeld sent you a letter on August 8, 2022, directing you to provide additional information related to your need for continued absence. Specifically, the letter directed you to provide the expected duration or end date for the period of illness or incapacity." (*Id.* at 100.) Ultimately, DHS stated that Turbyfill "failed to return to work on September 15, 2022, and[,] as of the date of this letter, [had] not contacted [her] supervisor, Human Resources, Protected Leave, or anyone within the department to explain [her] absence or provide additional information regarding [her] continued absence"; that she had "not returned to work, nor [had she] provided medical documentation to support [her] continued absence"; and concluded that "[a]t this point you have been absent without authorization since September 15, 2022, which is in excess of two consecutive days . . . you [will] be separated from your position for job abandonment." (*Id.*) Floyd, Neufeld, Woodall, and Lay were involved in the decision to terminate Turbyfill, and they had access to Turbyfill's file and communications with Floyd. (*Id.* at 196–97; Doc. 25-3, at 127–28.)

Turbyfill avers that she could have returned to work on October 10, 2022, and that she would have returned to work had she not been terminated. (Doc. 26-1, at 5.) Turbyfill responded to her termination letter, stating that she had been commutating with Floyd, that she had sent documentation from Dr. Hall in the past, and that she "was just cleared to return to work from [Dr. Hall] with a return date of October 10th." (Doc. 25-2, at 286.) After her termination, on December 2, 2022, Turbyfill requested that Dr. Hall provide a letter stating that she had

visited Dr. Hall on September 14, 2022, and that, during the visit, Dr. Hall had cleared Turbyfill to return to work on October 10, 2022. (Doc. 25-3, at 52–53.) Dr. Hall provided this letter, in which she stated that Dr. Hall and Turbyfill "discussed her ability to return to work full time without restrictions starting in October with a date of [October 10, 2022]." (*Id.* at 88.)

During Turbyfill's absence, DHS distributed her caseload to the four remaining Southeast 1 team members. (*Id.* at 117.) Turbyfill had about twenty cases during this time, and the other licensing consultants had between twenty and twenty-five cases. (*Id.*) These employees normally worked forty-hour weeks. (Doc. 26-1, at 2.) But, due to the extra cases, the other teams members worked in excess of forty hours a week during Turbyfill's absence, and because the position was salaried, they did not receive additional pay for doing so. (*Id.*; Doc. 25-3, at 117.) Lay worked around forty-five hours a week, and the other three team members worked around forty-two or forty-three hours a week during Turbyfill's absence. (Doc. 25-3, at 117.) Turbyfill averred that such extra work was unnecessary because licensing consultants can handle between thirty-five and forty cases without working overtime. (Doc. 26-1, at 3–4.)

On April 13, 2023, Turbyfill filed the present action. (Doc. 1.) In her compliant, Turbyfill asserts claims for the following violations of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, including: (1) failure to communicate and engage in an interactive process; (2) failure to provide a reasonable accommodation; (3) disability discrimination; and (4) retaliation. (*Id.* at 4.) On March 4, 2024, DHS moved for summary judgment on all claims against it (Doc. 15), and that motion is ripe for the Court's review.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

III.    ANALYSIS

The Rehabilitation Act bars entities that receive federal funds from discriminating against

any "qualified individual with a disability." 29 U.S.C. §§ 794(a)–(b). Discrimination includes failing to make a reasonable accommodation to disabled employees. 42 U.S.C. § 1211(b)(5)(A). The Rehabilitation Act also incorporates Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.* 29 U.S.C. § 791(f). Accordingly, Courts analyze claims under the Rehabilitation Act using largely the same standards as claims brought under the ADA. *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 344–45 (6th Cir. 2020) (citation omitted). The main difference between the two statutes is the Rehabilitation Act's more stringent causation standard. *Id.* at 345. Unlike the ADA, where a plaintiff must show that the entity took an adverse employment action "because of" her disability—a but-for causation standard—a Rehabilitation Act plaintiff must show that an entity took an adverse employment action "solely by reason of" her disability. *Id.*

### A.    Failure to Accommodate

Another difference between the two statutes is relevant in this case; the parties disagree on whether disability-discrimination claims involving an employer's failure to reasonably accommodate a disability under the Rehabilitation Act necessarily involve direct evidence or whether the indirect-evidence framework can apply. (Doc. 16, at 15 (arguing under the indirect-evidence framework)); (Doc. 26, at 17 (arguing "[t]he Sixth Circuit has explained that the direct evidence test applies to claims for failure to accommodate")).

However, the Court need not answer this question, because Turbyfill's claim fails under either method.[3] Under the direct-evidence method, to establish a prima facie case of

---

[3] The Sixth Circuit has adopted Turbyfill's position—that failure-to-accommodate claims necessarily involve direct evidence and must be analyzed under the direct-evidence framework—but only in ADA cases. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416–17 (6th Cir. 2020). However, in *Fisher*, the court also noted that another Sixth Circuit case, *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), applied the indirect-evidence framework to a failure-to-accommodate

discrimination based on a failure to accommodate, a plaintiff must show: (1) she is disabled; and that (2) that she is "otherwise qualified" for the position despite her disability either: (a) without accommodation from her employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation. *Fisher*, 951 F.3d at 417. Similarly, when proceeding with indirect evidence, a plaintiff must first establish a prima facie case by showing that: (1) she is disabled; (2) she was "otherwise qualified" for the position; (3) the employer was aware of her disability; (4) an accommodation was needed; and (5) the employer failed to provide the necessary accommodation. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997) (citation omitted). Once the plaintiff presents a prima facie case under either method, the burden shifts to the employer to demonstrate that it cannot reasonably accommodate the disability, because the accommodation would impose an "undue hardship" on the employer. *Id.* at 1175–76 (citation omitted). Regardless of which framework is applied, Turbyfill's failure-to-accommodate claim fails because no reasonable jury could find that she requested a reasonable accommodation before her termination.[4]

---

claim under the Rehabilitation Act. 951 F.3d at 417 (citing *DiCarlo*, 358 F.3d at 419). The court distinguished *DiCarlo*, noting "though the two statutes have many similarities, they are not identical." *Id.* (citation omitted). This Court has applied the indirect-evidence framework to a failure-to-accommodate claim under the Rehabilitation Act. *See Bingham v. McDonough*, 2:20-cv-34, 2022 WL 1924810 (E.D. Tenn. June 3, 2022) (applying the indirect-evidence framework to a failure-to-accommodate claim under the Rehabilitation Act and noting that "the Sixth Circuit has yet to apply [the rule that the direct-evidence framework applies in all failure-to-accommodate claims] to claims under the Rehabilitation Act"). The parties did not address this issue in their briefings. Regardless, the Court need not answer this question.

[4] Courts have analyzed whether the plaintiff requested a reasonable accommodation under different elements of the prima facie case. Some courts have analyzed this as whether an accommodation was needed, *see Stanciel v. Donahoe*, 570 F. App'x 578, 583 (6th Cir. 2014), some have analyzed this as whether the employee was "otherwise qualified" with a proposed reasonable accommodation, *see Norsworthy v. Kroger Co.*, No. 98-6604, 2000 WL 32026, at *3 (6th Cir. Jan. 6, 2000), and others have analyzed this as a threshold issue before discussing any elements of a prima facie case. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1044 (6th Cir. 1998); *Jones v. Univ. of Memphis*, No. 2:15-cv-02148, 2016 WL 11496100, at *6 (W.D.

A plaintiff cannot succeed on a failure-to-accommodate claim if she does not request a reasonable accommodation before her termination. *See Melange v. City of Center Line*, 482 F. App'x 81, 86 (6th Cir. 2012). While "medical leave can constitute a reasonable accommodation," *Williams v. AT&T Mobility Services LLC*, 847 F.3d 384, 394 (6th Cir. 2017), "for a leave of absence to be a reasonable accommodation . . . the employee must, at a minimum, provide the employer with an estimated, credible date when she can resume her essential duties." *Cooley v. E. Tenn. Hum. Res. Agency, Inc.*, 720 F. App'x 734, 741 (6th Cir. 2017) (citations omitted). Similarly, an employee has not requested a reasonable accommodation when she only states that she does not know when she will be able to return to work. *Gantt*, 143 F.3d at 1047. A "vague estimate" of when an employee can return to work is also insufficient. *See Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000). A request for indefinite leave is also not a reasonable accommodation. *See Gantt*, 143 F.3d at 1047.

Here, the undisputed facts demonstrate that Turbyfill never provided DHS with an estimated, credible date when she could return to work before her termination. Although Turbyfill argues that she requested "a medical leave of slightly more than six months," (Doc. 26, at 19), that six-month figure is purely based on her hindsight; six months is the amount of leave she would have requested had she communicated a return-to-work date to DHS. But DHS did not know Turbyfill's return-to-work-date. On the day DHS terminated Turbyfill, she had not provided her return-to-work date to DHS or any information that would allow it to calculate her return-to-work date. After her September 14, 2022 reevaluation, Dr. Hall cleared Turbyfill to return to work on October 10, 2022. (Doc. 25-3, at 71–72.) Floyd testified that he never

_____

Tenn. Sept. 9, 2016). Regardless of which elements this inquiry best fits, necessarily, to establish a claim that DHS failed to accommodate her disability, Turbyfill must demonstrate that she requested a reasonable accommodation.

received this update from Dr. Hall or Turbyfill, and he informed his coworkers he did not receive this information. (Doc. 25-2. at 186, 281.) Turbyfill does not present evidence contesting this fact; she also testified that she does not remember if anyone sent the letter in which Dr. Hall cleared her to return to work to DHS, that she does not remember if she followed up with Dr. Hall to make sure she sent the letter to DHS, and that she does not remember if Dr. Hall told her that she sent the letter to DHS. (*Id.* at 51–52.) In her briefing, Turbyfill even admits that she "did not inform [] Floyd about her September 14 visit with Dr. Hall before she was terminated six days later." (Doc. 26, at 23.) She also averred that Neufeld's August 8, 2022 letter asked for the projected end date of her leave, but "Dr. Hall had not determined a return-to-work date at that time." (Doc. 26-1, at 5.)

Turbyfill only informed DHS that she could not return to work—she never communicated when she could return. Turbyfill's last communication to DHS before her termination was an August 23, 2022 email to Floyd, informing DHS that she previously had COVID-19 and was suffering from complications. (Doc. 25-2, at 96.) Prior to that, the latest information Turbyfill communicated was that Dr. Hall had "provided all the needed information" and that she would "be evaluated again in September," which she communicated on August 18, 2022. (*Id.* at 95.) She did not respond to DHS's request for additional information about her return-to-work date. (*Id.* at 37–38.)

As a result, at the time it terminated Turbyfill, DHS only possessed the following information about her disability: (1) because of an incident that occurred on March 27, 2022, Turbyfill suffered from arthritis, emotional trauma, ongoing muscular spasms and muscle fatigue, and a concussion (*id.* at 223–24); (2) Dr. Hall's best estimate for the duration of treatment was "pending" and that she estimated Turbyfill's conditions would last two months (*id.*

at 222–23); (3) Dr. Hall evaluated Turbyfill on June 23, 2022, and recommended extending her time off work and hoped to allow her to return to work after a July 15, 2022 reevaluation (*id.* at 253); and (4) Dr. Hall reevaluated her on July 15, 2022, and again recommended extending her time off work and again hoped to allow her to return to work after a September 14, 2022 reevaluation. (*Id.* at 267.) None of this information established a return-to-work date or allowed DHS to reasonably estimate such a date. Formulating the amount of leave Turbyfill required with only the above information would have required DHS to speculate as to the amount of leave while knowing little about her underlying conditions—other than that they had lasted almost four months longer than Dr. Hall originally expected; it is not required to do this. *See Gantt*, 143 F.3d at 1046–47 ("The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."). DHS had no way of knowing whether Dr. Hall would clear Turbyfill to return to work immediately following her September 14, 2022 reevaluation, or if, as she had done twice prior, Dr. Hall would schedule another reevaluation. Accordingly, the undisputed facts demonstrate that Turbyfill never provided DHS with an estimated, credible date on which she could return to work.

Since Turbyfill did not inform DHS that she could return on a specific date, she effectively requested that DHS extend her leave for an indefinite period until her doctor cleared her to return to work. This is not a request for a reasonable accommodation. *See Gantt*, 143 F.3d at 1047 ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.") (citation omitted).

Nonetheless, Turbyfill argues that, because Floyd told her that "Employee Relations doesn't need any specific form" and that "[i]f anything else is needed I'll follow up," Turbyfill rightly relied on these statements and believed no further information was needed. (Doc. 26, at

24.)  This is not what Floyd told her.  While Floyd said DHS did not need a *specific form*, he did not say it did not need any *more information*; in fact, he specifically requested that Turbyfill provide "additional information" that would allow DHS "to examine how long you have been out and what [] your return to work timeline looks like since it has shifted back several times" in the same email from which Turbyfill draws these quotes.  (Doc. 25-2, at 273.)  Turbyfill did not provide this information before her termination.

Turbyfill also argues that DHS should have followed up with her when she did not submit an update from Dr. Hall because doing so "was consistent with the parties' practice while [she] was on leave."  (Doc. 26, at 23.)  She argues that, by failing to do this, DHS did not engage in the interactive process in good faith.  (*Id.* at 24.)  Lastly, Turbyfill argues that, if DHS did so, "it would have known that [she] was only requesting an accommodation of an additional 26 days . . . which is reasonable on its face."  (*Id.*)  However, this does not save Turbyfill's claim, because DHS's duty to engage in the interactive process in good faith did not arise since Turbyfill never requested a reasonable accommodation.  *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002) (holding that, because the plaintiff "failed to request a reasonable accommodation from her employer, the defendant's duty to engage in an interactive search for a reasonable accommodation never arose").

Even so, DHS engaged in good-faith efforts to obtain Turbyfill's return-to-work date or information that would allow it to estimate her return-to-work date.  An employer can request medical records supporting the employee's requested accommodation.  *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 809 (6th Cir. 2020).  DHS did so.  On July 5, 2022, Woodall, emailed Turbyfill the forms to request leave as an accommodation, and, when Turbyfill did not complete these forms, Harris followed up on July 14, 2022.  (Doc. 25-2, at 83, 257.)  Turbyfill

testified that she never responded to Harris.  (*Id.* at 37–38.)  Again, on August 8, 2022, DHS requested "additional information and documentation regarding [Turbyfill's] medical condition." (*Id.* at 269.)  When Turbyfill told Floyd she was confused, Floyd clarified that DHS needed information to "examine how long you have been out and what [] your return to work timeline looks like."  (*Id.* at 93–94.)  Still, Turbyfill did not respond to DHS's inquiries or provide any additional information until after her termination.  While Floyd acknowledged that it usually took Dr. Hall several days to submit medical statements after a visit with Turbyfill and that he expected another statement from Dr. Hall after the September 14 visit, DHS waited six days after Turbyfill's visit before terminating her.  Turbyfill's failure to provide this information supports a finding that she, rather than DHS, failed to adequately communicate regarding her disability. *See Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018) ("Examples of how a party may fail to engage in the [interactive] process in good faith include . . . failing to adequately communicate or provide information during the process.") (citations omitted).

Accordingly, Turbyfill has failed to establish a prima facie case of failure to accommodate, and the Court will grant DHS's motion for summary judgment on this claim.

## B.    Disability Discrimination[5]

A claim of disability discrimination under the Rehabilitation Act can be demonstrated using either direct or indirect evidence.  *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 (6th Cir. 2022) (citation omitted).  Turbyfill argues that DHS's failure to accommodate her disability is direct evidence of discrimination.  (Doc. 26, at 25.)  As discussed above, DHS did

---

[5] Turbyfill bases her discrimination claim solely on DHS's failure to accommodate her disability. (Doc. 26, at 25.)  As discussed above, DHS did not fail to accommodate Turbyfill's disability. Nonetheless, the Court will briefly discuss why Turbyfill's disability-discrimination claim independently fails.

not fail to accommodate Turbyfill's disability, and Turbyfill has not proffered any other direct evidence from which a reasonable jury could conclude that DHS discriminated against her based on her disability. Therefore, to survive summary judgment, Turbyfill must proffer indirect evidence of discrimination under the *McDonell Douglas* framework. *Bledsoe*, 42 F.4th at 578 (citation omitted). Under the *McDonnell Douglas* framework, the plaintiff first bears the burden of establishing a prima facie case of disability discrimination, which requires the plaintiff to show that: (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Id.* (citation omitted).

As discussed above, Turbyfill cannot show that she was otherwise qualified for her position with a reasonable accommodation, because she did not request a reasonable accommodation. Even assuming Turbyfill established a prima facie case, the burden then shifts to DHS to articulate a legitimate, nondiscriminatory reason for its decision to terminate Turbyfill. *See Bledsoe*, 42 F.4th at 581 (citation omitted). DHS has done so because unexcused absences are a legitimate, non-discriminatory reason. *See Love v. Elec. Power Bd. of Chattanooga, EPB*, 392 F. App'x 405, 408 (6th Cir. 2010) (concluding that "unauthorized absences" are a legitimate, non-discriminatory reason for termination).

Because DHS produced a legitimate, non-discriminatory reason for Turbyfill's termination, the burden shifts back to Turbyfill, and she must provide evidence showing that DHS's proffered reasons are pretext for discrimination. *See Bledsoe*, 42 F.4th at 581 (citation omitted). To establish pretext, Turbyfill can show the reason offered: (1) has no basis in fact; (2) did not actually motivate the decision to terminate; or (3) was insufficient to motivate the

decision to terminate. *Id.*

In this case, Turbyfill has not put forth evidence that would allow a reasonable jury to find that DHS's offered reason for her termination was pretext. She does not argue that she was not absent; instead, she only argues that, in not extending her leave despite no request to do so, DHS failed to accommodate her disability. As discussed above, Turbyfill did not request leave, and, therefore, DHS did not fail to accommodate her disability. Given this, Turbyfill's absences were unexcused. Therefore, no reasonable jury could find that DHS's stated reason for Turbyfill's termination was pretextual. Accordingly, DHS is entitled to summary judgment on this claim.

### C.     Failure to Engage in the Interactive Process

If an employee never requests a reasonable accommodation, the employer has no duty to engage in the interactive process. *See Lockard*, 52 F. App'x at 788 (6th Cir. 2002). As discussed above, no reasonable jury could find that Turbyfill requested a reasonable accommodation, and, therefore, DHS's duty to engage in the interactive process never arose. Additionally, as previously discussed, it was Turbyfill, not DHS, that failed to communicate or provide information. Therefore, DHS is entitled to summary judgment on this claim.

### D.     Retaliation[6]

For the same reasons as Turbyfill's discrimination claim, there is no direct evidence that DHS terminated Turbyfill due to her engaging in protected activity. Therefore, she must proffer indirect evidence of retaliation under the *McDonell-Douglas* framework. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. ex rel J.C. v. Shelby Cnty. Bd. of Educ.*, 711

---

[6] Again, Turbyfill solely relies on DHS's failure to accommodate her disability as the basis for this claim. (Doc. 26, at 25–26.) Nonetheless, the Court will briefly discuss why this claim independently fails.

F.3d 687, 697 (6th Cir. 2013)).  Under the *McDonell-Douglas* framework, the plaintiff first bears

the burden of establishing a prima facie case of retaliation, which requires the plaintiff to show

that:  "(1) the plaintiff engaged in activity protected under the [Rehabilitation Act]; (2) the

employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4)

there was a causal connection between the protected activity and the adverse action."  *Id.*

"Establishing a prima facie case of retaliation is a 'low hurdle.'"  *Id.* (quoting *Gribcheck v.*

*Runyon*, 245 F.3d 547, 551 (6th Cir. 2001)).  After establishing a prima facie case of retaliation,

the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the

adverse employment action.  *A.C. ex rel. J.C.*, 711 F.3d at 697.  Finally, the burden returns to the

plaintiff, who must show by a preponderance of the evidence that the defendant's offered

legitimate, non-discriminatory reason was pretext for unlawful retaliation.  *Id.*  "To demonstrate

pretext, a plaintiff must show both that the employer's proffered reason was not the real reason

for its action, *and* that the employer's real reason was unlawful."  *E.E.O.C. v. Ford Motor Co.*,

782 F.3d 753, 767 (6th Cir. 2015) (en banc).

Here, even assuming that Turbyfill has established a prima facie case of retaliation—

which DHS disputes—for the same reasons the Court discussed when analyzing her

discrimination claim, no reasonable jury could find that DHS's legitimate, non-discriminatory

reason for Turbyfill's termination, unexcused absences, was pretext for unlawful retaliation.

Accordingly, DHS is entitled to summary judgment on this claim.

IV.    **CONCLUSION**

For the above-stated reasons, DHS's motion for summary judgment (Doc. 15) is

**GRANTED**.  Turbyfill's claims against DHS will be **DISMISSED WITH PREJUDICE**.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

_/s/ Travis R. McDonough_____
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**